# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

MACHAL, INC.

CIVIL ACTION NO. 04-CV-1304

-vs-

JUDGE LITTLE

JENA BAND OF CHOCTAW
INDIANS, ET AL.

## Memorandum Ruling[1]

Before the court are a Motion for Summary Judgment by Plaintiff, Machal, Inc. ("Machal") and a Motion to Dismiss by Defendants, Tri-Millennium Corporation, Inc. ("Tri-Millennium") and BBC Entertainment, Inc. ("BBC"). Machal's Second Amended Complaint seeks declaratory judgments on three issues and asserts a pendent jurisdiction claim for unjust enrichment. First, Machal asks the court for "supplemental and declaratory relief, seeking the injunction of litigation in a Louisiana state court that does not possess subject matter jurisdiction . . . ." Second, Machal also seeks a declaration that the documents sued upon in that state court action are void. Third, Machal requests that the court declare settlement agreements executed in connection with the state court action void. Finally, Machal asserts a state law claim for unjust enrichment. For the following

---

[1] Much of the following discussion is also presented by the court in a Memorandum Ruling entered on this day in the companion case <u>Jena Band of Choctaw Indians, et al. v.Tri-millennium Corp., Inc., et al.</u>, Civil Action No. 98-0829.

reasons, Defendants' Motion to Dismiss is granted as to Plaintiff's first two causes of action, Plaintiff's Motion for Summary Judgment is granted as to the third cause of action, and Plaintiff's pendent state law claim is dismissed.

## I. Procedural and Factual History

In 1995, the Jena Band of Choctaw Indians ("Jena Band") became a federally recognized Indian tribe and began to seek reservation lands in Louisiana upon which it could operate a gambling casino. In furtherance of its intention to operate a casino, Jena Band entered into several agreements with Tri-Millennium and BBC, including the Memorandum of Understanding dated 14 March 1996, the Extension of the Memorandum of Understanding dated 14 May 1996, the Development Agreement dated 18 October 1996 and the Term Sheet dated 19 March 1997 ( collectively the "Development Agreements"). In the Development Agreements, Tri-Millennium and BBC promised to assist Jena Band with various aspects of developing a casino, including acquiring land, constructing a casino, and obtaining various government approvals. As compensation for their assistance, Jena Band promised them the right to control certain aspects of the casino development and the right to certain payments.

Pursuant to 25 U.S.C. § 2711, however, contracts for the management of a tribal gaming operation ("management contracts") must be approved by the National Indian Gaming Commission ("NIGC"). If a management contract is not approved by the NIGC, it is void. 25 C.F.R. § 533.7 (West 2005). Jena Band contacted the NIGC by letter in October of 1996 seeking a declination letter – which is essentially an opinion letter by the NIGC – stating that it does not believe that the

Development Agreements require approval because it does not consider the agreements to be management contracts. See 25 C.F.R. § 502.15 (West 2005). In its response, however, the NIGC stated that it believed that the Development Agreements were management contracts and that they would be void, therefore, without NIGC approval.

Jena Band informed BBC and Tri-Millennium that the Development Agreements were void. It did not seek the NIGC's approval of the agreements, but instead, in October of 1997, Jena Band entered into a Financing and Brokerage Agreement with Machal in which it assigned to Machal many of the rights and responsibilities that it had previously assigned to Tri-Millennium and BBC in the Development Agreements.

In response, BBC and Tri-Millennium filed suit in the 24th Judicial District Court, Jefferson Parish, Louisiana. They asserted various causes of action against Jena Band, including a claim for breach of contract. Jena Band did not seek to remove the state court suit. It filed a declinatory exception with the Louisiana court in which it contended that the state court was without subject matter jurisdiction. That issue was litigated in the state court, which found that it did have subject matter jurisdiction over the dispute. Jena Band then brought suit in this court seeking a declaratory judgment that the Development Agreements are void pursuant to the Indian Regulatory Gaming Act ("IGRA"), specifically 25 U.S.C. § 2711, and that the state court lacks subject matter jurisdiction to hear the breach of contract action. Between the time the state court suit was filed and the filing of the case before this court, the state court also entered a preliminary injunction enjoining Jena Band from negotiating for the development or management of a casino. The state court's finding that it possessed subject matter jurisdiction and its order entering a preliminary injunction were later upheld

3

by the Louisiana Fifth Circuit Court of Appeals.

On 16 December 1998, this court entered a ruling staying the proceedings before it based on a finding that it was required to abstain by the Anti-Injunction Act. 28 U.S.C. § 2283 (West 2005). Since that time, however, the parties and Machal entered into four agreements: the Co-Managers Agreement entered into by Machal, BBC and Jena Band on 24 October 2000 ("Co-Managers Agreement"), the Agreement entered into by Machal, BBC and Jena Band on 2 November 2000 ("Agreement"), the Compromise and Settlement Agreement between Jena Band, Machal and BBC signed on 24 October 2000 ("BBC Settlement Agreement") and the Settlement and Compromise Agreement between Jena Band, Machal and Tri-Millennium signed on 24 October 2000 ("Tri-Millennium Settlement Agreement"). The two Settlement and Compromise Agreements purport to settle all claims related to the contractual rights between the parties based on the Development Agreements. Based on the BBC Settlement Agreement, the state court entered a judgment dismissing with prejudice all claims by BBC. The state court action is still pending as to Tri-Millennium and Jena Band, however, but it is currently stayed.

## II. Law and Analysis

**A.     Standard of Review**

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly

bears the burden of proof that jurisdiction does in fact exist.

Ramming v. U.S., 281 F.3d 158, 161 (5th Cir. 2001) (internal citations omitted).

Summary judgment may be granted to the moving party only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In the case we now consider, resolution of the issues presented depends only upon statutory and contractual interpretation, both of which are matters of law decided by the court. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc. 467 U.S. 837, 843 (1984) ("The judiciary is the final authority on issues of statutory construction . . . ."); First Nat'l Bank of Jackson v. Pursue Energy Corp., 799 F.2d 149, 151 (5th Cir. 1986) ("A district court may grant summary judgment when a contract is unambiguous . . . . and [its] determination that a contract is unambiguous is a conclusion of law.").

**B.     State Court Subject Matter Jurisdiction**

Plaintiff requests that the court issue a declaratory judgment finding that the state court was without subject matter jurisdiction to consider the underlying dispute between Jena Band, Tri-Millennium and BBC, and that we nullify the state court's injunction on those grounds. Machal, however, is not a party to the state court proceeding, and therefore, does not have standing to contest its validity.

Even if we were to assume, *arguendo*, that Machal has standing to seek a declaration that the state court acted without subject matter jurisdiction, "the principles of res judicata apply to questions

of jurisdiction as well as to other issues." Am. Sur. Co. v. Baldwin, 287 U.S. 156, 166 (1932); Babers v. Babers, 312 So. 2d 896, 897 (La. App. 2 Cir. 1975). The court, therefore, does not have jurisdiction to question a Louisiana state court's determination that it possesses subject matter jurisdiction over a controversy, regardless of whether this court agrees with that determination. "[I]f the jurisdiction of a tribunal is actually brought into question in the proceeding before it, such tribunal has the power to determine its own jurisdiction, and once determined, whether right or wrong, that decision cannot ordinarily be attacked collaterally." Mike Hooks, Inc. v. Pena. 313 F.2d 696, 699 (5th Cir. 1963). The state court, after full litigation, determined that it has subject matter jurisdiction over the underlying dispute concerning the Development Agreements. That decision was subsequently appealed and upheld. This court does not have jurisdiction to review collaterally that determination. For these reasons, Machal's cause of action seeking a declaratory judgment and preliminary injunction based on its contention that the state court acted without subject matter jurisdiction is dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(1).

**C.  Validity of the Development Agreements**

Plaintiff also requests that the court enter a declaratory judgment finding that the Development Agreements among Jena Band, Tri-Millennium and BBC are void pursuant to the IGRA. This court, however, is without jurisdiction to make such a declaration because Machal does not have standing to attack the validity of agreements to which it is not a party. Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd., 854 F.2d 745, 748 (5th Cir. 1988). "In order to maintain standing to raise a claim in federal court . . . the plaintiff must be the proper proponent of the particular legal

6

rights upon which the suit is based." Id. Plaintiff is not a party to the Development Agreements that it seeks to have declared void, and therefore, it does not have standing to contest the validity of those agreements.

Machal argues that it is a third-party beneficiary of that agreement, and therefore, has standing to assert Jena Band's rights. Third-party standing, however, is only available when the party in whom the rights are vested lacks the ability to assert those rights itself. Id. Jena Band has contested the validity of the Development Agreements in another action before this court. It is clear, therefore, that Jena Band can assert its own rights and that Machal does not have third-party standing to assert those rights on Jena Band's behalf. Because Machal does not have standing to contest the validity of the Development Agreements, that cause of action is dismissed with prejudice.

### D.  Validity of the Settlement Agreements

Plaintiff asserts that the settlement agreements entered into in connection with the underlying state court litigation are void pursuant to 25 U.S.C. § 2711 and 25 C.F.R. § 533.7, which provide that management contracts for tribal gaming operations that are not approved by the NIGC are void. Machal is a party to the settlement agreements, and therefore, it has standing to contest their validity. Furthermore, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 to determine the validity of the settlement agreements because it is pursuant to federal law that Plaintiff asserts their invalidity.

### 1. Indicia of a Management Contract

Machal's argument that the settlement agreements are invalid rests on the premise that each of those agreements is a management contract under federal law. Pursuant to 25 C.F.R. § 533.7, "[m]anagement contracts . . . that have not been approved by the Secretary of the Interior or the Chairman . . . are void." The court must determine, therefore, if any of the four agreements entered into in relation to the underlying state court litigation is a management contract that is void without NIGC approval. There is no precedent in the Western District of Louisiana or in the Fifth Circuit to guide the court in determining what constitutes a management contract. The recent Tenth Circuit opinion in First American Kickapoo Operations v. Multimedia Games, Inc., however, addressed the issue. –F.3d–, 2005 WL 1463501, *5-6, (10th Cir. 2005). While this opinion has no precedential value in this district, the court finds the reasoning of the Tenth Circuit persuasive and will employ the test used by the Tenth Circuit in determining whether the agreements are management contracts.

A rule promulgated by the NIGC pursuant to the IGRA defines a management contract as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15 (West 2005). Although management is not defined under either a statute or the regulations promulgated by the NIGC, a management official is defined as "one who has authority . . . [t]o set up working policy for a gaming operation." First American Kickapoo Operations, 2005 WL 1463501 at *5-6. (citing 25 C.F.R. § 502.19 (West 2005)). While this is too vague to supply the court with a definition of management, it does indicate that a necessary condition for a management contract is that it grant to a party other than the tribe some authority with regard to a gaming operation.

In determining what types of authority transfers indicate that a document is a management contract, the Tenth Circuit considered the types of terms that 25 U.S.C. § 2711 and in 25 C.F.R. § 531.1 require to be articulated in a management contract.[2] These terms create certain rights and responsibilities, and thereby, they give content to the word "management." The terms that indicate a transfer of management authority include, *inter alia*, the following:

1. Transferring responsibility for the performance of the daily operations and maintenance of a gaming operation.

2. Transferring responsibility for the establishment and maintenance of accounting procedures for the gaming operation.

3. Transferring responsibility for financing procedures such as financial reporting and the paying of taxes, employees and other costs.

4. Setting term limits for transfers of powers or conferrals of rights.

5. Quantifying the payments or compensation to which the parties are entitled.

6. Delineating the sources from which payments are to be made. In particular, specifying whether payments are to be based on a percentage of net revenues realized by a gaming operation.

7. Transferring responsibility for and control over the construction of a gaming operation.

25 U.S.C. § 2711 (West 2005); 25 C.F.R. § 531.1 (West 2005).

In light of these terms, the court will review each of the agreements in an effort to determine if they grant to a party other than the tribe management authority with regard to a gaming operation.

---

[2] The Tenth Circuit also noted that the NIGC, in NIGC Bulletin 94-5, states that it considers similar factors in determining whether an agreement is a management contract.

Prior to this, however, the court must address two issues. First, Machal contends that the NIGC has previously determined that the disputed agreements are management contracts and that such a determination is owed Chevron deference. Second, because the NIGC states that some of the agreements at issue were collateral to management contracts, the court must determine what types of collateral agreements are void without NIGC approval.

### 2. NIGC Action

As proof that the settlement agreements are management contracts, Plaintiff cites a letter written by a deputy general counsel for the NIGC, which is dated 30 April 2001. Plaintiff contends that this letter is evidence of a NIGC determination that the settlement agreements are management contracts. This letter is not, however, a final determination by the NIGC. It is an expression of the NIGC's belief that the agreements and other related documents are management contracts or collateral agreements that are subject to its approval. As such, it is only an advisory opinion or opinion letter. It is not, as Plaintiff contends, a final determination by the NIGC that the agreements are management contracts.

In an opinion letter, dated 23 August 2000, the NIGC clearly indicates that the letters it sends stating that certain contracts are management contracts requiring NIGC approval are merely statements of its opinion. Furthermore, under 25 U.S.C. § 2714 and 25 C.F.R. § 533.4, only determinations to approve or disapprove a management contract made by the *Chairman* of the NIGC after a "complete submission" are final determinations. A "complete submission" of a management contract for approval requires the parties to the provide the NIGC with more than just the contracts themselves. See 25 C.F.R. § 533.3 (West 2005). A letter from the NIGC, dated 30 May 2002,

clearly indicates that the parties failed to provide it with the documents requisite for a "complete submission." Therefore, the Chairman of the NIGC did not make a final determination that the agreements are management contracts, and there is no NIGC action to which this court owes deference. First American Kickapoo Operations, 2005 WL 1463501 at *6 (holding that opinion letters and bulletins published by the NIGC are not entitled to Chevron deference). The court will, however, address the concerns of the NIGC in the following sections.

### 3. Collateral Agreements

In its opinion letter dated 30 April 2001, the NIGC seems to assert that collateral agreements are void without NIGC approval. While the court is hesitant to create a strawman from the NIGC's letter, Plaintiff urges the court to construe the letter in this manner. We must note, however, that such a contention would be incorrect. An agreement's being collateral to a management contract is not a sufficient condition for it to be void under 25 C.F.R. § 533.7.

A collateral agreement is defined as "any contract . . . that is related, either directly or indirectly, to a management contract." 25 C.F.R. § 502.5. Under 25 C.F.R. § 502.15, a collateral agreement may be considered a management contract, but only if it "provides for the management of all or part of a gaming operation." Similarly, under 25 U.S.C. § 2711(a)(3), collateral agreements are subject to approval by the NIGC, but only if that agreement "relate[s] to the gaming activity."

The provisions of 25 C.F.R. § 533.7 only void management contracts that have not been approved by the NIGC. In other words, only those collateral agreements that should also be considered management contracts because they provide for the management of a gaming operation

are void without NIGC approval. Therefore, even if one of the agreements entered into by the parties is a collateral agreement, pursuant to 25 C.F.R. § 502.5, because it is related to a management contract, it still would not be void for lack of NIGC approval unless it also provides for the management of a gaming operation.

Beyond the plain language of the applicable statues and regulations, the policies motivating the enactment of the IGRA, which include providing for "tribal economic development, self-sufficiency, and strong tribal governments," also support finding that only those collateral agreements that provide for the management of a gaming operation are void. 25 U.S.C. § 2702(1) (West 2005). If any contract that relates to the eventual development of an anticipated gaming operation is construed as a management contract – collateral or otherwise – it would be more difficult for tribes to acquire the economic assistance often needed for procuring land and paying the expenses necessary to the creation of a gaming operation and obtaining the requisite governmental approvals. Potential investors would be unable to contract with tribes, and therefore, they would not be able to ensure that they could recoup any of the money they invested in the tribe.

It is in the best interest of tribes that they be able to enter into enforceable contracts that are precursors to the creation and licensing of a gaming operation. Without such contracts, many tribes would not be able to procure the financial backing that is often necessary for the creation of gaming operations. Such a state of affairs would thwart the policies underlying the IGRA. By making it easier for tribes to obtain financial backing, we make it easier for tribes to acquire the economic development and self-sufficiency that accompanies the income from tribal gaming operations.

For these reasons, the court finds that only collateral agreements that also provide for the

management of all or part of a gaming operation are void without NIGC approval.

### 4. The Settlement Agreements are Management Contracts

The first agreement that we must consider is the Co-Managers Agreement entered into by Machal, BBC and Jena Band. In this agreement, the parties attempt to avoid its being found a management contract by stipulating that it is not a "gaming agreement." The requirements of the IGRA, however, cannot be so easily avoided. The agreement makes BBC responsible for coordinating the construction and operation of the first Jena Band gaming operation, as well as for providing and arranging for the financing of the construction of the first gaming operation. See 25 C.F.R. § 531.1 (West 2005). Further, it provides that Machal and BBC "shall provide oversight management" for the first gaming operation, and delineates the allocation of authority between Machal and BBC as co-managers. The agreement assigns the types of rights and responsibilities usually included in a management contract. It gives Machal and BBC authority over the management of an anticipated gaming operation. The court finds, therefore, that the Co-Managers Agreement is a management contract that is void without NIGC approval.

The second agreement that we must consider is the Agreement entered into by Machal, BBC and Jena Band, the terms of which show that it is related to the Co-Managers Agreement. Several factors indicate that this agreement creates the type of rights and responsibilities allocated in a management contract. First, the Agreement requires Jena Band to pay the notes on loans it receives from Machal for construction and other costs from the net revenues made from a gaming operation. See 25 C.F.R. § 531.1 (West 2005). Second, it assigns to Jena Band and Machal the right to "joint

13

approval on construction and design and the name of any gaming and/or gaming related facilities constructed in accordance with the First Amended and Restated Financing and Brokerage Agreement by and between Jena [Band] and Machal." Third, it gives to Machal the right of joint approval over the banks into which the gaming revenue realized from a gaming operation will be placed. See id. Finally, Jena Band promises that Machal will be allocated 30% of the total net gaming revenues. Each of these contractual provisions assigns responsibility for management activities. 25 C.F.R. § 531.1. The court finds, therefore, that the Agreement it is a collateral agreement that is void without NIGC approval because it provides for the management of all or part of a gaming operation.

The third agreement we must consider is the BBC Settlement Agreement. This agreement states that it is "intended to settle the claims of [Jena Band, Machal and BBC] regarding contractual rights" related to the Development Agreements. The NIGC, in its opinion letter of 30 April 2001, contends that this agreement is a management contract because, under the agreement, Machal and BBC are to be co-managers of the first Jena Band gaming operation and are described as having management authority. Under the terms of this agreement, BBC has three primary responsibilities. First, BBC is to release all claims against Jena Band related to the contracts at issue in the state court proceedings in exchange for $500,000, which is to be paid by Machal. Second, BBC agrees to arrange for the financing of the construction of and initial operating capital for the first gaming operation according to terms acceptable to Jena and Machal in exchange for a promissory note equal to the value of those services. Third, BBC is to enter into a Co-Managers Agreement with Machal that specifies the allocation of managerial responsibility between Machal and BBC.

Machal also agrees to several obligations. First, it agrees to begin the process of acquiring land for Jena Band and to fund certain environmental and other studies necessary for Jena Band to

14

begin a gaming operation in exchange for a promissory note for its expenses. Second, Machal agrees to enter into good faith negotiations with Jena Band, after a Tribal-State Compact has been entered into, for the creation of a financing and development agreement for the construction of a gaming operation. Third, Machal agrees to enter into good faith negotiations with Jena Band and BBC for the creation of a management contract to be submitted to the NIGC. The parties also agree to certain terms, some of which are specified in the Co-Managers Agreement, that are to be included in a management contract that will be negotiated. Finally, Machal agrees to pay BBC $500,000 in exchange for a promissory note in that amount from Jena Band.

Jena Band, for its part, makes three primary promises in the BBC Settlement Agreement. First, it agrees to the payment of the various promissory notes mentioned above. Second, it agrees to give Machal and BBC the exclusive right to gaming on the first gaming operation and the exclusive right to enter into a management contract with Jena Band for the management of its first gaming operation. Third, it promises to enter into good faith negotiations for the creation of a management contract and agrees that certain terms, including percentage of gaming revenues to be paid and the length of the anticipated management contract, will be included in a management agreement Jena Band will submit to the NIGC for its approval.

The NIGC refers to various provisions of this agreement to support its contention that it is a management contract. First, it cites Section 2.1(c) of the agreement, which refers to BBC and Machal as being co-managers of the first gaming operation to be commenced by Jena Band. Read in context, however, it is clear that this provision does not actually transfer any management authority to Machal or BBC. The pertinent part of that section reads: "Machal and BBC shall enter into good faith negotiations to develop a management agreement with Jena whereby Machal and

15

BBC will be named co-managers of the first Gaming Operation." In this provision of the agreement, Jena Band promises to enter into negotiations for a management agreement that will give management authority to BBC and Machal and will include certain provisions dealing with compensation and the length of the agreement; it does not, however, actually allocate to either of those parties any management authority.

Second, the NIGC cites Section 2.2(c), in which BBC and Machal agree to enter into a Co-Managers Agreement that dictates certain allocations of management authority between Machal and BBC that will be included in a future management contract. In this section, however, Jena Band does not grant to either BBC or Machal the right to manage any aspect of an anticipated gaming operation, Jena Band only agrees to include certain provisions in a future management contract yet to be negotiated. The provision does not actually transfer to BBC or Machal any management authority over a gaming operation, therefore, it does not provide for the management of a gaming operation. It is only an agreement by Jena Band to include certain terms in a future management contract that must be submitted to the NIGC for its approval.

While we disagree with the opinion of the NIGC as to those provisions of the BBC Settlement Agreement, another provision of that agreement does, however, transfer to Machal or BBC authority over an anticipated gaming operation. The agreement grants to Machal and BBC the exclusive right to "gaming on the first Gaming Operation . . . and the exclusive right to enter into a management contract with Jena [Band]." This arrangement is not only exclusive of other potential management contractors, but also excludes Jena Band from operating a gaming operation on its own. It is an alienation by Jena Band of its right to manage gaming operations located on tribal lands in Louisiana. The BBC Settlement Agreement, therefore, "provides for the management of a gaming

16

operation." Accordingly, the court finds that it is a management contract that is void without NIGC approval pursuant to 25 C.F.R. § 502.15.

The final agreement we must consider is the Tri-Millennium Settlement Agreement. That agreement requires Tri-Millennium to relinquish its claims against Jena Band in exchange for a payment of $1,350,000. In addition to this amount, which was paid to Tri-Millennium upon the execution of the Settlement Agreements, the agreement also contemplates various sales of Tri-Millennium's stock that are contingent upon the NIGC's approving a gaming operation for Jena Band, a management contract between Jena Band and Machal, or a financing and development agreement between Jena Band and Machal. In the event that one of these conditions precedent obtains, Tri-Millennium is entitled to payment of $5,000,000 in exchange for all of its stock. Additionally, upon the opening of a gaming operation by Jena Band, Tri-Millennium is entitled to additional payments totaling $20,000,000.

The NIGC seems to assert that this agreement is void for lack of NIGC approval solely because it is an agreement collateral to a management contract, not because it contains any of the terms that would indicate that it is a management contract. This agreement, however, contains the same fatal flaw that afflicts the BBC Settlement Agreement. It contains a provision that grants to Machal and BBC the exclusive right to "gaming on the first Gaming Operation . . . and the exclusive right to enter into a management contract with Jena [Band]." It is, therefore, a collateral agreement that provides for the management of a gaming operation and is void without NIGC approval.

### E. The State Law Unjust Enrichment Claim

The final cause of action asserted by Machal is for unjust enrichment. That claim is a state law claim over which Machal requests that the court assert supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Under that statute, if the claims over which the court has original jurisdiction are dismissed, then the court has discretion to dismiss any claims over which it has supplemental jurisdiction. Id. In such situations, "the general rule is to dismiss any pendent claims." Bass v. Parkwood Hosp., 180 F.3d 234, 246 (5th Cir. 1999). The court should, however, "consider the factors of judicial economy, convenience, fairness, and comity" before dismissing the pendent claims. Smith v. Amedisys Inc., 298 F.3d 434, 447 (5th Cir. 2002). These factors do not warrant this court's continuing to exercise pendent jurisdiction. This proceeding has not progressed sufficiently to implicate concerns about judicial economy, and requiring Plaintiff to bring its action in state court does not impose upon it any great inconvenience or unfairness. Furthermore, because the void agreements forming the gravamen of Plaintiff's unjust enrichment claim were intended to be state court settlement agreements, the court finds that the state of Louisiana has a significant interest in adjudicating that claim. Plaintiff's claim for unjust enrichment is dismissed without prejudice because the causes of action upon which the court's original jurisdiction were based have been dismissed before trial.

### Conclusion

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED to the extent that Plaintiff's claims for declaratory relief concerning the Development Agreements and the state court's assertion of jurisdiction are DISMISSED WITH PREJUDICE because this court is without

jurisdiction to hear those claims. In all other respects, Defendants' Motion to Dismiss is DENIED.

Furthermore, Plaintiff's Motion for Summary Judgment is GRANTED, but only to the extent that it requests that this court issue a declaration that the settlement agreements are void without NIGC approval. Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that the Co-Managers Agreement, the Agreement, the BBC Settlement Agreement, and the Tri-Millennium Settlement Agreement are management contracts that are void without NIGC approval.

Finally, Plaintiff's claim for unjust enrichment is DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3).

Alexandria, Louisiana

21 July 2005

_____
F. A. LITTLE, JR.
UNITED STATES DISTRICT JUDGE